[Civ. No. 19018.   Second Dist., Div. Two.   Sept. 26, 1952.]

ETHEL M. HANDLEY, Appellant, v. ROY HANDLEY, Respondent.

Edward A. Norstrand for Appellant.

James L. Grubbs for Respondent.

FOX, J.—This is an appeal by the plaintiff from that part of an interlocutory judgment of divorce adjudicating a certain parcel of real property to be community property rather than the separate property of plaintiff, and awarding the same to the parties in equal proportions, subject to a lien in favor of plaintiff for $2,348.

The parties met in Salem, Oregon, in 1940. Defendant was a sign painter by trade with a ninth-grade education. Plaintiff, who was divorced, lived with her 14-year-old daughter. She was unemployed and on state relief. After a courtship of a year they left Salem for Seattle in the fall of 1941 pursuant to an agreement to pool their money for the purchase of a piece of income property since neither alone had sufficient means with which to accomplish their purpose. Plaintiff had $600 which she had obtained as alimony from her former husband. Defendant had a less amount of cash upon their arrival in Seattle after having paid the expenses of the trip. In Seattle they leased a rooming house and purchased furniture for it, each putting up an equal amount of money. They improved the property, increased its income substantially and after operating it for 16 months sold their interest for $1,700. A dispute arose over the division of the proceeds of the sale. A settlement was reached by which defendant received $340.

As a result of this dispute, the parties "broke off their engagement." Upon learning about a week later that defendant intended to come to California, plaintiff expressed a desire to accompany him and the parties "renewed their engagement." They planned to get a piece of income property in California and develop it as they had done in Seattle. Defendant insisted, however, that the aftermath of the Seattle venture would not be repeated as "he did not want any more one-sided dealings." He demanded "a fifty-fifty proposition." Plaintiff agreed to this arrangement. They discussed the community property law of California as a means of insuring such a division.

Before leaving Seattle, however, plaintiff had made a trip to see her former husband and collected $1,000 alimony. She then had $1,500 cash; defendant had $650 in cash, an automobile and trailer.

At plaintiff's suggestion it was agreed plaintiff should keep her funds intact, and defendant would use his money to pay their expenses, including those of plaintiff's daughter, to

California. They made the journey in defendant's car and trailer. Upon arrival in Santa Monica they searched for income properties for some weeks. Finally defendant learned of the opportunity to buy the real property involved in this action and made a deposit thereon. At the time of entering into the escrow agreement plaintiff and defendant, in the presence of the escrow clerk and real estate saleslady, had a discussion between themselves as to how the title to the property should be taken. Plaintiff stated she would like the title in her name and that it made no difference as it was community property. Defendant said it made no difference to him as they were going to be married and had agreed on a fifty-fifty proposition. Accordingly, title was taken in plaintiff's name.

The parties moved into the premises on April 23, 1943, and were married on May 1, 1943. After their marriage they from time to time discussed the fact that the property was community property.

Prior to taking possession the parties agreed defendant would remodel and improve the housing facilities on the property so as to increase the income, and plaintiff would collect the rentals and use them to pay for the furniture they would have to buy with which to equip the apartments. After moving into the property defendant devoted his entire time for three months to remodeling, modernizing, painting and otherwise improving the premises. He also borrowed on his car and used these separate funds with which to purchase materials for the improvements.

The property was subject to two trust deeds. Payments were made on these by each of the parties. Those made by defendant came from the residue of the funds he brought from Seattle and from his earnings. Payments made by plaintiff apparently came from the rentals except two which totaled $2,348. This amount came from the proceeds of an insurance policy on the death of plaintiff's son and a lien was established by the judgment herein on the property in plaintiff's favor for that amount.

In working out the details of their earlier agreement and the operations of this business venture the parties, after their marriage, decided the utilities, groceries and other living expenses would be paid from defendant's earnings and the income from the apartments would be used to pay for the furniture and to make the payments on the trust deed obligations against the property. This arrangement, generally, seems to

have been carried out. However, defendant appears to have made a number of payments on the encumbrances.

The parties filed joint federal income tax returns from 1943 to and including 1950. These returns were executed by both parties. During this entire eight-year period they split their total income which included the income from this property as well as the earnings of defendant. In the 1945 federal return on the line which showed their total income there was typed in the words "community property."

In the fall of 1947 plaintiff arranged another loan on the property for the purpose of building an additional house thereon. Defendant was at the time visiting his former home in Nebraska. It seems his return was delayed in order that he might take part in a big pheasant hunt. In a letter to him protesting the priority he was giving his hunting trip plaintiff said, "It makes me mad to think that comes before the building of *your* home." (Italics added.)

Plaintiff's first contention is that the evidence is insufficient to support the finding that the property is community property. It is pointed out there can be no community interest in the absence of a marriage. (*Mooney* v. *Mooney*, 91 Cal.App. 2d 118 [204 P.2d 630].) Therefore, since the parties were not married at the time the property was acquired, it was not then community. Consequently, if the property acquired the status of community property this must have resulted from a valid agreement, either prenuptial or postnuptial, since title was initially taken in plaintiff's name and there was no conveyance by either of any interest in the property. Such an agreement may be oral if it is confirmed by the subsequent acts and conduct of the parties. (*Kenney* v. *Kenney*, 220 Cal. 134 [30 P.2d 398]; *Estate of Sehabiague*, 47 Cal.App.2d 793 [119 P.2d 30]; *Estate of Piatt*, 81 Cal. App.2d 348 [183 P.2d 919].) Plaintiff concedes the evidence is sufficient to warrant an implied finding that prior to their marriage the parties entered into an oral agreement to treat their subsequently acquired property as community after their marriage. ■ The issue then is whether the evidence is sufficient to justify an implied finding that the oral prenuptial agreement was sufficiently confirmed by the acts and conduct of the parties after their marriage. Clearly, the evidence supports such a finding.

There are a series of acts and a complete course of conduct on the part of defendant which indicates he confirmed their prenuptial oral agreement. He remodeled the property

and otherwise improved it, using both separate and community funds for that purpose. He also made payments on the trust deeds. Plaintiff argues, however, these acts are without significance since the improvement of the property by him and the expenditure of his separate and their community funds thereon and in meeting payments on the trust deeds are presumed to be a gift to her since his labor was a community asset and he had control and management of the funds. She further contends defendant's act and course of conduct are not sufficient to confirm the oral prenuptial agreement; that to produce such a legal consequence there must be acts and conduct on the part of both the parties indicating such a confirmation. She insists there are no such acts or conduct on her part so indicating. She is, however, in error. For eight consecutive years she signed a joint federal income tax return splitting their total income including the income from this property along with the earnings of defendant. Such a course of conduct is highly significant. (*Estate of Raphael*, 91 Cal.App.2d 931, 936-937 [206 P.2d 391]; *Frymire* v. *Brown*, 94 Cal.App.2d 334, 339 [210 P.2d 707]; *Heck* v. *Heck*, 63 Cal.App.2d 470, 475 [147 P.2d 110].) Added significance is afforded by reason of the notation on one of the early returns of "community property." Plaintiff's reference to "your home" in her letter to defendant in 1947 is also revealing. Finally, the conversations of the parties from time to time after their marriage, at least up to the time plaintiff began to talk about kicking defendant out, based on the premise that the property was community, are important. (*Stice* v. *Stice*, 81 Cal.App.2d 792, 798 [185 P.2d 402]; *Durrell* v. *Bacon*, 138 Cal.App. 396, 403 [32 P.2d 644].) These facts and circumstances are sufficient to support an inference of plaintiff's confirmation of their oral prenuptial agreement to treat the property as community.

"That such agreement not only existed between the parties but was in fact consummated during their marriage is established and affirmed by their acts and conduct in purchasing, improving and dealing with the property during their marriage." (*Mooney* v. *Mooney*, 91 Cal.App.2d 118, 121 [204 P.2d 630].) Hence the court properly concluded the property was community, subject, however, to a lien in favor of plaintiff for $2,348.

Plaintiff further contends that if there was an agreement between the parties it is fraudulent and void. She bases this contention on section 158, Civil Code, which de-

clares a confidential relationship is presumed to exist between a husband and wife, and argues that the burden is on the husband to show any agreement with his wife is fair, just and fully understood by her. The simple answer to this argument is that section 158 has no application to the making of this oral agreement because the parties were not married when it was made, hence the confidential relationship did not, as a matter of law, exist and the parties could deal with each other at arm's length.

If perchance it be argued that section 158, Civil Code, has some application because the acts and conduct which confirm the prenuptial oral agreement took place after their marriage the answer is that an examination of this entire transaction justifies an inference that it was completely fair and just to the plaintiff. As to plaintiff's fully understanding their deal; it will be recalled that when in Seattle they first discussed coming to California they agreed upon a "fifty-fifty proposition" and understood the community property law here so provided. When they were at the escrow office it was plaintiff who first suggested title be put in her name; that it didn't make any difference as it was community property. Defendant acquiesced because they were going to be married and had agreed on "a fifty-fifty proposition" and he thought it didn't make any difference how title stood. Plaintiff appears to have understood the significance of community property insofar as income taxes are concerned. She certainly was not making any claim to the property as her own when she wrote defendant in 1947. It is a reasonable inference from all the dealings between the parties and the way this transaction was handled in its entirety that the defendant did not mislead or misinform the plaintiff in any degree as to her rights under their agreement.

The judgment is affirmed.

Moore, P. J., and McComb, J., concurred.